IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10–cv–02022–WYD–KMT

WYATT T. HANDY JR.,

     Plaintiff,

v.

CHIEF DIGGINS, individual & official capacity,
MAJOR V. CONNORS, individual & official capacity,
CHAPLAIN SCOTT, individual & official capacity,
MR. BURRIS, individual & official capacity, and

     Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Magistrate Judge Kathleen M. Tafoya**

     This matter is before the court on "Defendants' Motion and Brief for Summary Judgment." (Doc. No. 204, filed July 17, 2012 [Mot.].)  Plaintiff filed his Response (Doc. No. 219 [Resp.]) and a Declaration in support thereof (Doc. No. 220 [Handy Decl.]) on August 28, 2012.  Defendants filed their Reply in Support of their Motion for Summary Judgment on September 17, 2012. (Doc. No. 229 [Reply].)  Accordingly, this matter is ripe for the court's review and recommendation.  For the following reasons the court recommends that Defendants' Motion be granted in part and denied in part.

## STATEMENT OF FACTS

The following factual background is derived from Plaintiff's Second Amended Prisoner Complaint (Doc. No. 153, filed Feb. 8, 2012 [SAC]) and the parties submissions with respect to this Recommendation.  The facts discussed below are not genuinely disputed unless otherwise noted.

In this case, Plaintiff Wyatt Handy Jr. maintains that Defendants violated his constitutional rights, the Religious Land Use and Institutionalized Persons Act (RLUIPA), and various state tort laws by failing to provide him with a kosher diet while he was incarcerated at the Denver County Jail (DCJ).  Before delving into Plaintiff's particular allegations, the court finds it appropriate to provide a brief overview of the DCJ's historical and current practices with respect to religious diet accommodations.

### A.    *Background of DCJ Practices with Respect to Religious Diet Accommodations*

Prior to 2008, the DCJ did not have a comprehensive policy for administering religious diets, which resulted in an unexpectedly large number of inmates requesting and receiving religious diets without verification of the sincerity of their religious beliefs.  (Mot. at 5, ¶ 7.) Defendants maintain that the large number of religious diets provided to inmates caused a significant adverse impact on the DCJ's fixed annual operating budget.  (*Id.* ¶ 8.)  More specifically, Defendants maintain that, in 2007, the DCJ had a budget deficit directly attributable to the increased cost associated with providing religious diets, which required the Denver City Council to appropriate additional funds to cover the budgetary shortfall.  (*Id.* ¶ 9.)

In February 2008, the DCJ command staff conducted a comprehensive review of the religious diet program at the DCJ.  (*Id.* ¶ 10.)  The review staff surveyed other metropolitan county jails; analyzed numerous alternatives for providing religious diets to inmates, including the possibility of preparing kosher meals in-house; and surveyed religious food suppliers to learn about the alternatives available for purchasing prepared and prepackaged food.  (*Id.* ¶ 10.)

Following the comprehensive review, the DCJ elected to serve a certified kosher diet prepared and prepackaged by food suppliers in accordance with acceptable religious practices because it represented a more cost-effective solution than other alternatives, such as preparing kosher meals in-house.  (*Id.* ¶¶ 11-12.)

However, even with this modification, providing religious diets is still costly for the DCJ. The DCJ maintains three primary diet programs, only two of which are relevant here.[1]  The first is a standard repeating four-week menu of meals that may contain meat or poultry and a variety of fruits and vegetables.  (*Id.* ¶ 15.)  The standard inmate diet does not include pork or pork by-products.  (*Id.* ¶ 16.)  The average per-inmate cost of a standard diet meal at the DCJ in 2010 was $1.14 per meal and the average daily cost of three standard meals was $3.42 per day.  (*Id.,* ¶ 20.)

The second diet is a specialized kosher diet.  (*Id.* at ¶ 17.)  This religious diet is designed to accommodate the practices of a number of religious groups that prohibit adherents from eating certain foods or foods which have come in contact with prohibited foods.  (*Id.*)  As mentioned

---

[1] The third diet program is a medical diet which may vary depending on each inmates' specific needs.  (Mot. Summ. J. at 8, ¶ 19.)  There is no allegation that Plaintiff was denied a medical diet.

3

above, because of the strict requirements for kosher food preparation and the additional costs associated with maintaining a separate kosher kitchen to meet these requirements, the DCJ specially purchases pre-made TV-style kosher meals which contain meat and chicken that are certified to be ritually slaughtered and prepared consistent with religious requirements.  (*Id.* ¶ 18.)  In 2010, the average per-inmate cost of a religious kosher diet meal was $3.67 per meal and the average daily cost of three such meals was $11.01 per day.  (*Id.* ¶ 21.)

Following the 2008 comprehensive review, the DCJ also implemented a religious diet program that requires all inmates wishing to obtain a religious diet to complete a standardized DCJ Request for Special Diet Based on Religious Beliefs (hereinafter "Religious Diet Request") and sign a DCJ Religious Diet Agreement.  (*Id.* ¶ 13; Ex C, Affidavit of John Scott ¶ 4 [Scott Aff.].)  Defendants maintain that the purpose of this process is to verify the sincerity of the inmates' claimed religious dietary requirements.  The Religious Diet Request requires that an inmate disclose, among other things, (1) his religious affiliation; the current temple, mosque, or church he attends; the name of his rabbi, imam, or pastor; and the last date he attended a religious service.  (*See id.,* Ex. C.3.)  Defendants contend that, before an inmate is authorized to participate in the religious diet program, "the religious officials listed by the inmate must verify that the inmate meets the requirements of the faith group to be recognized as a member and that the faith group requires a special religious diet."  (*Id.* at 6-7, ¶ 13.)

Although Plaintiff agrees that the DCJ religious diet program requires DCJ staff to verify that inmates are members of the religion they claim, Plaintiff disputes Defendants' assessment that the program also requires staff to verify the sincerity of the inmates' claimed religious dietary requirements.  (Resp. at 5, ¶ 13.)  Plaintiff maintains that the Religious Diet Agreement

4

serves this latter purpose by providing relatively strict conditions for an inmate's continued participation in the Religious Diet Program.  (*Id.*)  More specifically, Plaintiff maintains that, under the Religious Diet Agreement, if an inmate is found to have acted in a manner suggesting his or her religious beliefs are not sincerely held,  it may be grounds for termination from the religious diet program.  (*Id.*)

The religious diet program is reflected in writing in two places.  First, Denver County Sheriff Department Order 4910.1C, effective March 26, 2009 (hereinafter "Religious Programs Order"),[2] states, in pertinent part, as follows:

> Purpose: This order establishes policy and procedure within the jails that encourage inmate participation in religious services in accordance with their Constitutional Rights.  This policy ensures that ties with outside religious institutions are maintained, that pastoral counseling is secured and that religious literature and materials during confinement are obtained.
>
> Policy: The Denver Sheriff Department respects the right of all inmates wishing to participate in religious worship. This will be accomplished by providing a chapel and/or locations for religious services or programs.
>
> Religious Diet and Symbols:  Specific religious requirements sometimes mandate a diet of certain foods or the elimination of certain foods. Other religious ceremonies require the donning of symbols of the religious sect. Efforts will be made to comply with reasonable requests that entail special diets or the wearing or displaying of religious symbols. Some restrictions based on security concerns may be necessary.

(Mot., Ex. A-1.)

Further, the DCJ Inmate Handbook provides, in pertinent part:

> If you have any special needs based specifically on your religious beliefs, you need to send a kite to the Chaplain requesting a Declaration form.  **INMATES**

---

[2] The order is actually dated December 14, 2010.  (*See* Mot., Ex. C.1.)  However, Defendants maintain that it was effective beginning in March 2009.  (*Id.* at 4-5, ¶ 6.)

5

**MUST MAKE ANY AND ALL RELIGIOUS DECLARATIONS UPON ENTRY TO THE FACILITY. ALL DECLARATIONS MUST BE VERIFIABLE THROUGH A SOURCE OUTSIDE OF THE JAIL (CLERGY, RABBI, IMAM, ETC.)** The above listed expectations will make the operation of the jail easier and help create a more stable and safe environment for staff and inmates.

(Mot., Ex. C-1) (Emphasis in original.)

**B.      *Plaintiff's Allegations***

On February 17, 2010, when Plaintiff was booked into the DCJ, he informed the booking officer that he was Muslim and required a kosher diet.  (SAC at 4, ¶ 1.)  More specifically, as an Islamic practitioner, Plaintiff believes that he is forbidden by the Qu'ran from consuming any non-halal food or meat, and that this prohibition is fundamental to his religion.  (Doc. No. 220, Declaration of Wyatt T. Handy Jr., ¶¶ 2-3.)  Plaintiff believes that, based on the teachings of the Qu'ran, kosher food is halal and therefore lawful for Muslims to eat.  (*Id.* ¶ 4.)

The processing officer documented Plaintiff's request and explained that, to receive a religious diet, Plaintiff had to submit a request, or "kite," to Defendant Scott, the DCJ Chaplain, for authorization.  (*Id.*)  Plaintiff asserts that he promptly submitted several kites to Defendant Scott but did not receive an immediate response.  (*Id.*)

On February 24, 2010, one week after his booking, Plaintiff met with Defendant Scott.  (Mot. at 9, ¶ 26.)  During that meeting, Plaintiff submitted a Religious Diet Request and signed the Religious Diet Agreement.  (*Id.* at 9, ¶ 26; Ex. C.3 & C.4.)  On the Religious Diet Request form, Plaintiff requested a kosher diet.  (*Id.*, Ex. C.3.)  Plaintiff further indicated that he converted to Islam in 1997 while in the custody of the Colorado Department of Corrections; that the mosque he currently attended was "D.O.C. #55343 Limon/Adams County Jail 11-2008 til 4-

6

2009 Denver County Jail 5-2007/11-2008"; that his current Imam was "Talib Deen"; and that he last attended a religious service six weeks before his incarceration.  (Mot. at 9, ¶¶ 27, 29; *see also id.,* Ex. C.1.)  "Talib Deen" is actually Taalibdin AL-Amin, a volunteer community clergy member and an advisor to Muslim inmates incarcerated at the DCJ.  (*Id.* ¶ 28.)

Chaplain Scott indicated that he would have a response regarding kosher meals by March 1, 2010.  (SAC at 5, ¶ 2.)  However, Plaintiff did not receive a response by March 1, 2010, and on March 4, 2010, he submitted a kite to Defendant Connors, the operations major at the DCJ.  (SAC at 5, ¶ 3.)  In the kite to Defendant Connors, Plaintiff "explained his religious affiliation, the misconduct that was taking place, and mentioned how this information is documented in the Colo. Dept. of Corrections ["CDOC"], various county jails, including the DCJ."  (*Id.* ¶ 4.)  Defendant Connors never responded to this kite.  (*Id.*)

On March 19, 2010, Plaintiff submitted the first of several grievances related to not receiving a kosher meal.  (*Id.* at 5-6, ¶ 5.)  In the grievance, Plaintiff again explained that he has been a Muslim since 1997 and listed the CDOC, the Adams County Detention Facility, and the Arapahoe County Detention Facility as verifiable sources.  (*Id.*)  Plaintiff further explained how his religious affiliation was documented in DCJ records as he participated in the holy month of Ramadan in 2007 and 2008 while he was previously detained at the DCJ.  (*Id.*)

On April 10, 2010, when he did not receive a response to his March 19, 2010 grievance within ten working days as he contends is required by DCJ policy, Plaintiff submitted a kite to Defendant Scott and a separate kite to Defendant Diggins, the Division Chief of the DCJ.  (*Id.* at 6, ¶ 7.)  In the kite directed to Defendant Scott, Plaintiff expressed his concern and frustration over being ignored for close to two months regarding his kosher diet request.  (*Id.*)  In that kite

directed to Defendant Diggins, Plaintiff explained the "misconduct that was taking place and requested his intervention." (*Id.*) Defendants Scott and Diggins did not respond to Plaintiff's kites. (*Id.*)

At some unspecified time after obtaining Plaintiff's completed Religious Diet Request, Chaplain Scott contacted a CDOC representative in Limon, Colorado. (Mot. at 10, ¶ 31.) Chaplain Scott was informed by the CDOC representative that Plaintiff's prison record confirmed that he self-identified as a Muslim and that Plaintiff did not receive a religious diet while incarcerated in the CDOC. (*Id.* ¶ 32.) Chaplain Scott also contacted Mr. AL-Amin. (*Id.* ¶ 33.) Mr. AL-Amin also confirmed that Plaintiff was a Muslim, but stated that a kosher diet was not a requirement of Plaintiff's religious practice because the DCJ standard diet does not include pork or pork by-products. (*Id.* ¶ 34.) As such, Mr. AL-Amin informed Chaplain Scott that the standard inmate diet was acceptable for Plaintiff. (*Id.*)

Plaintiff admits that he did not receive a special religious diet while he was in CDOC custody. (Handy Decl., ¶ 10.) However, Plaintiff maintains that he has not been in CDOC custody since 2004 and it was not until December 2008 that his religious beliefs evolved to include the belief that non-halal food and meat is forbidden. (*Id.* ¶ 11.)

Based on the CDOC representative's and Mr. AL-Amin's representations, Chaplain Scott informed Defendant Connors that Plaintiff did not qualify for participation in the DCJ religious diet program because Plaintiff's references did not confirm that Plaintiff's religious practice required a special diet. (Mot. at 10-11, ¶ 35.) Accordingly, on April 15, 2010, Defendant Connors wrote Plaintiff a letter denying his Special Diet Request because he did not meet the

DCJ requirement to obtain a religious diet.  (*Id.* at 11, ¶ 36.)  However, contrary to Defendant Scott's findings, the letter stated:

> While you declared at booking that you were of the Islamic faith, it appears that the only time you attempt to or claim to practice that religion is when you are incarcerated . . . .   You have not been incarcerated in the last couple of years, yet you cannot state which mosque you attend, nor can anyone verify that you are a practicing member of any mosque . . . .  You gave us no information to work with so your request was denied.

(Mot., Ex. D.)  Defendant Burris, the DCJ Programs Coordinator, and Defendant Diggins received a copy of the letter.  (*Id.* at ¶¶ 31, 36.)

Plaintiff contends that Defendant Connors' assertion that Plaintiff had not been incarcerated for the last couple of years was incorrect, because Plaintiff had been incarcerated at the Adams County Detention Facility from November 7, 2008 to April 14, 2009.  (SAC at 7, ¶ 10.)  Plaintiff further contends that DCJ policy does not require that he demonstrate which mosque he attended or even that he was a practicing member of a mosque.  (*Id.* ¶ 11.)  Rather, he maintains that DCJ policy merely requires that his religious declaration be verifiable through a source outside the jail.  (*Id.*)  Plaintiff also contends that Defendants knew he is Muslim because on December 30, 2008, Defendant Burris confirmed to the Programs Coordinator at the Adams County Detention Facility that Plaintiff is Muslim.  (*Id.* at 12-13, ¶ 33.)  Ultimately, Plaintiff asserts that he did everything, exactly the way it's outlined in the DCJ policy, and was nevertheless denied a kosher diet.  (*Id.*)

On April 23, 2010, Plaintiff submitted a general release authorization form to DCJ staff requesting all records relating to Plaintiff being a Muslim.  (*Id.* at 11, ¶ 26.)  DCJ staff never responded to this request.  (*Id.*)

On April 27, 2010, Plaintiff submitted a second grievance contesting his denial of a kosher meal and providing additional verification information. (*Id.* at 8-9, ¶ 14, 16.)  Plaintiff maintains that, although the second grievance was addressed to Defendant Connors, under DCJ grievance policy, it would have been forwarded directly to Defendant Diggins.  (*Id.* at 8, ¶ 15.) Plaintiff maintains that Defendant Diggins never contacted Plaintiff's verifiable sources, and never answered or responded to Plaintiff's grievance.  (*Id.* at 9, ¶ 16.)

On May 7, 2010, after not receiving a response to his April 27, 2010 grievance, Plaintiff submitted a final grievance to Defendant Diggins.  (*Id.* ¶ 17.)  Plaintiff again "outlined the misconduct that was taking place . . . and again requested [Defendant] Diggins to intervene and stop the misconduct." (*Id.* ¶ 18.)  Plaintiff never received a response to the final grievance from Defendant Diggins, nor did Defendant Diggins "do anything to stop the misconduct that was taking place, although he was aware of it." (*Id.*)

On May 12, 2010, Plaintiff was transferred from the DCJ to the Arapahoe County Detention Facility.[3]  (*Id.* at 11, ¶ 27.)  Plaintiff submitted a change of address requesting that Defendant Diggins forward any and all correspondence related to his request for a kosher diet to his new address.  (*Id.* at 12, ¶¶ 28-29.)  Plaintiff did not receive any responses from Defendant Diggins at his new address.  (*See id.* ¶ 29.)

## PROCEDURAL HISTORY

Plaintiff commenced this action by filing a Prisoner Complaint on August 23, 2010.  In that iteration of his Complaint, Plaintiff asserted two claims pursuant to 42 U.S.C. § 1983 for

---

[3] It appears that Plaintiff was approved for a religious diet at the Arapahoe County Detention Facility.  (*See* Handy Decl. ¶ 36.)

violations of his First Amendment free exercise rights and his Fourteenth Amendment equal

protection rights, respectively, as well as a claim against Defendants in their official capacities

for a violation of RLUIPA.

On January 14 and February 25, 2011, respectively, Plaintiff filed two motions to amend

his complaint.  (Doc. Nos. 39 & 47.)  On May 6, 2011, Senior District Judge Wiley Y. Daniel

adopted this court's Recommendation (Doc. No. 52 [hereinafter "3/23/2011 Recommendation"])

that Plaintiff's motions to amend be granted in part and denied in part.  (Order, Doc. No. 57.)

Accordingly, Judge Daniel (1) granted Plaintiff's motions to amend to the extent that they sought

to add a claim under RLUIPA against Defendants in their individual capacity and a Due Process

claim seeking punitive damages; and (2) denied Plaintiff's motions to amend to the extent that

they sought to add official-capacity claims against Defendants for free exercise, due process, and

equal protection violations, and requests for injunctive and declaratory relief.  (*Id.*)

On July 20, 2011, Plaintiff filed a third motion to amend his complaint.  (Doc. No. 93.)

On February 8, 2012, Judge Daniel adopted this court's Recommendation (Doc No. 143

[hereinafter "12/21/2011 Recommendation"]) that Plaintiff's third motion to amend be granted in

part and denied in part.  (Order, Doc. No. 152 [hereinafter "2/8/2012 Order"].)  Specifically,

Judge Daniel denied Plaintiff's third motion to amend to the extent that plaintiff sought to add a

request for compensatory damages; claims for declaratory and injunctive relief; official-capacity

free exercise, equal protection, and due process claims; any claims against the City and County

of Denver and Mr. AL-Amin; and claims pursuant to 42 U.S.C. § 1983 and 1985(3) against

Defendant Burris.  (*Id.*) Judge Daniel granted Plaintiff's motion to amend in all other respects.

(*Id.*)

On October 9, 2012, Judge Daniel adopted this court's Recommendation (Doc. No. 222) that the "Panel of Islamic Clerics," which was added as a defendant by way of Plaintiff's third motion to amend, be dismissed without prejudice pursuant to Fed. R. Civ. P. 4(m) for lack of service.  (Doc. No. 234.)

Accordingly, at this juncture, the only remaining defendants to this action are Defendants Diggins, Connors, Scott, and Burris.  However, Defendant Burris is <u>not</u> a defendant in Plaintiff's § 1983 and § 1985(3) claims.  Further, of the claims that appear in Plaintiff's Second Amended Complaint, only the following claims remain pending: (1) a RLUIPA claim against Defendants in both their official and individual capacities; (2) § 1983 claims for violations of his free exercise, equal protection, due process rights against Defendants in their individual capacities; (3) a § 1983 conspiracy claim; (4) a § 1983 failure to intervene claim; (5) a conspiracy claim pursuant to 42 U.S.C § 1985(3); (6) a neglect to prevent claim pursuant to 42 U.S.C. § 1986; and (7) state law claims for negligence, negligence *per se,* negligent supervision, *respondeat superior,* and civil conspiracy.  (*See* SAC.)

## LEGAL STANDARD

### A.    *Summary Judgment Standard*

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518

(10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).  A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence.  *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Concrete Works*, 36 F.3d at 1517.  Moreover, because Plaintiff is proceeding *pro se*, the court, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys."  *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers").  At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record.  *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

# ANALYSIS

### A.   Claim One – RLUIPA

#### 1.   Individual Capacity

Although not directly raised by Defendants,[4] the court first considers whether RLUIPA provides a cause of action against Defendants in their individual capacities.  The court previously allowed Plaintiff to amend his Complaint to add RLUIPA claims against Defendants in their individual capacities.  The court allowed this amendment because, at that time, it was unclear whether RLUIPA authorized individual-capacity claims.  The Tenth Circuit recently held "there is no cause of action under RLUIPA for individual-capacity claims." *Stewart v. Beach,* 701 F.3d 1322, 1334 (10th Cir. 2012).[5]  Accordingly, the court finds that Plaintiff's RLUIPA claim is properly dismissed to the extent it is directed at Defendants in their individual capacities.

#### 2.   Official Capacity

Plaintiff's Claim One alleges that his rights under RLUIPA were violated when he was denied a kosher diet.  RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005). In pertinent part, RLUIPA provides that:

---

[4] The court has authority to consider this issue *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

[5] The court further notes that Plaintiff concedes that RLUIPA does not provide a cause of action against public officials in their individual capacities.  (*See* Resp. at 35.)

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person–

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "Thus, to proceed with his RLUIPA claim, [Plaintiff] must demonstrate he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government." *Abdulhaseeb v. Calbone,* 600 F.3d 1301, 1313 (10th Cir. 2010).

### a.      Sincerely Held Belief

Defendants do not dispute that Plaintiff's Islamic beliefs were and are sincere. (Mot. at 16.)  However, Defendants argue "Plaintiff cannot establish that the denial of his request for a kosher meal was a substantial burden on sincerely held religious beliefs because the references he provided on his application did not confirm that his particular religious practice required a religious diet in place of the standard DCJ diet." (*Id.* at 17.)  This argument, however, does not relate to the "substantial burden" prong of the RLUIPA inquiry.  Rather, the fact that Plaintiff's references may have failed to confirm that Plaintiff's particular beliefs required him to consume a kosher diet is relevant to whether or not Plaintiff sincerely believed that his Islamic faith required him to consume a halal diet.

The court finds there is a genuine dispute of material fact as to whether Plaintiff sincerely believed that his religious beliefs required him to consume a halal, or kosher, diet.  As a threshold matter, the court notes that Mr. AL-Amin's statement that the kosher diet served at the

DCJ was not a requirement of Plaintiff's religious practice is inadmissible hearsay.  (*See* Scott

Aff. ¶ 12.)  However, even if this fact were admissible, it still fails to establish that there is no

genuine issue of material fact that Plaintiff sincerely believed his Islamic faith required him to

consume a halal diet.  As noted in *Abdullhaseeb,* the mere fact that some Muslims "may find a

vegetarian or non-pork diet sufficient to satisfy Islam" does mean that Plaintiff may not

subscribe to a stricter Islamic dietary tradition.  600 F.3d at 1315; *see also Cutter,* 544 U.S. at

725 n.13 (quoting 42 U.S.C. § 2000cc-5(7)(A)) (Although RLUIPA "does not preclude inquiry

into the sincerity of a prisoner's professed religiosity," it does bar "inquiry into whether a

particular belief or practice is 'central' to the prisoner's religion"); *Thomas v. Review Bd. of Ind.*

*Emp. Sec. Div.,* 450 U.S. 707, 715 (1981) (differing beliefs and practices are not uncommon

among followers of a particular creed).  Indeed, contrary to Defendants' argument, "the issue is

not whether the lack of a halal diet . . . substantially burdens the religious exercise of any

Muslim practitioner"; the appropriate inquiry is "whether it substantially burdens [*Plaintiff's*]

own exercise of his sincerely held beliefs."  *Abdulhaseeb,* 600 F.3d 1301 (emphasis derived from

original).

To be sure, Defendants have also submitted uncontested (albeit, again, hearsay) evidence

that Plaintiff consumed standard prison food, rather than a religious diet, while he was

incarcerated with the CDOC.  (Scott Aff. ¶ 10.)  However, Plaintiff has submitted a plausible

explanation for this discrepancy.  Plaintiff was last in CDOC custody in 2004 and, since that

time, his Islamic beliefs have allegedly evolved to include the belief that a strictly halal diet is a

requirement of his faith.  (Handy Decl. ¶ 11.)  *See also Caruso v. Zenon,* No. 95-MK-1578

(BNB), 2005 WL 5957978, at *11 (D. Colo. July 25, 2005) (finding religious belief in a halal

16

diet was sincere even when the plaintiff purchased *haram* products from the prison canteen 30 times over a three year period.  The purchases "demonstrate[d] carelessness at best, and spiritual weakness at worst," but did not show that the intent to adhere to a halal diet was insincere).  Whether this explanation is credible is a question of fact for the jury.  *Id.* (citing *Mosier v. Maynard,* 937 F.2d 1521, 1526 (10th Cir. 1991)) ("Whether religious beliefs are sincerely held is a question of fact.")  Altogether, the court finds that Plaintiff has established a genuine issue of material fact for trial—to wit, whether he sincerely believed that his Islamic faith requires him to consume a halal or kosher diet.

> ### b.     *Substantial Burden*

Other than the misplaced argument discussed above that Plaintiff's religious exercise was not substantially burdened because his references did not confirm that he required a kosher diet, Defendants have failed to argue that the denial of kosher meals did not substantially burdened his religious exercise.  Nevertheless, the court confirms that there are genuine issues of material fact as to whether Plaintiff's religious exercise was substantially burdened.

> [A] religious exercise is substantially burdened under 42 U.S.C. 2000cc-1(a)
> when a government (1) requires participation in an activity prohibited by a
> sincerely held religious belief, or (2) prevents participation in conduct motivated
> by a sincerely held religious belief, or (3) places substantial pressure on an
> adherent either not to engage in conduct motivated by a sincerely held religious
> belief or to engage in conduct contrary to a sincerely held religious belief, such as
> where the government presents the plaintiff with a Hobson's choice-an illusory
> choice where the only realistically possible course of action trenches on an
> adherent's sincerely held religious belief.

*Abdulhaseeb,* 600 F.3d at 1315; *see also id.* at 1316-17 (whether a religious exercise has been substantially burdened is a question of fact).

17

In *Abdulhaseeb*, the Tenth Circuit held that a failure to provide a halal diet substantially burdened the Muslim plaintiff's religious exercise.

> It is a reasonable inference that [Oklahoma Department of Corrections'] failure to provide a halal diet either prevents Mr. Abdulhaseeb's religious exercise, or, at the least, places substantial pressure on Mr. Abdulhaseeb not to engage in his religious exercise by presenting him with a Hobson's choice–either he eats a non-halal diet in violation of his sincerely held beliefs, or he does not eat.

600 F.3d at 1316-17 (citations omitted).  The Tenth Circuit further supported its holding by noting that a number of other courts have found that a genuine issue of triable fact exists as to whether the lack of a halal diet creates a substantial burden on a Muslim's religious exercise.  *Id.* at 1317 (citing cases).

Here, unlike in *Abdulhaseeb*, the DCJ has a religious kosher diet available that meets halal standards.  Thus, this court is not presented with a complete failure to provide a halal diet like in *Abdulhaseeb*.  The question here instead is whether the DCJ policy requiring inmates to provide verifiable proof of the sincerity of their religious beliefs before they are eligible to receive that religious diet constitutes a substantial burden.

The court finds there is a genuine dispute on a material matter as to whether the DCJ policy constitutes a substantial burden on religious exercise.  The issue is not the policy's requirement that inmates provide *some* verification of their religious beliefs prior to receiving a religious diet *per se.  See Tapp v. Proto,* 404 F. App'x 563 (3d Cir. 2010) (citing *DeHart v. Horn,* 227 F.3d 47, 51 (3d Cir. 2000)) ("a prison is entitled to assess whether an inmate's dietary requirements are motivated by 'sincerely held' religious beliefs"); *but see Roberts v. Klein,* 770 F. Supp. 2d 1102, 1113 (D. Nev. 2011) ("Denying a kosher diet to those whose Jewish faith is not verified by an outside entity substantially burdens an inmates religious exercise.")  Rather,

the policy's shortcoming is that it does not include any standard or other guidance for resolving

religious diet requests, and therefore appears to require that inmates demonstrate the sincerity of

their religious beliefs to the subjective satisfaction of DCJ officials.

The Religious Diet Request form makes clear that the Community Chaplain, in this case

Defendant Scott, is required to substantively evaluate the information provided by the inmate

and approve or disapprove each inmate's request.  (*See* Mot., Ex. C.3.)  Apparently, however,

the DCJ policy is devoid of any guidance as to what evidence or information is sufficient for an

inmate to be eligible for the religious diet.  The Religious Programs Order does not provide any

such guidance or standard; it provides only that "*efforts* will be made to comply with reasonable

requests that entail special diets."  (Mot., Ex. C.1) (emphasis added).  The order's use of

"efforts" implies that, under the policy, the DCJ retains discretion to reject even *reasonable*

special diet requests.

The DCJ Inmate Handbook provides only that "[a]ll [religious] declarations must be

verifiable through a source outside of the jail (clergy, rabbi, imam, etc.)."  (*Id.,* Ex. C.2)

(emphasis omitted).  The Handbook fails to elucidate what exactly an inmate must declare or

submit before he will qualify for a religious diet.

The lack of any appreciable standard or guidance thus appears to vest the Chaplain, or

any other DCJ staff members so tasked, with unfettered discretion in resolving religious diet

requests.  This creates an unwarranted risk that an inmate's otherwise valid request for a

religious diet will be denied arbitrarily and capriciously.

The facts of this case capably demonstrate the policy's potential shortcomings.  In

reviewing Plaintiff's request, Defendant Scott concluded that Plaintiff did not qualify for the

DCJ religious diet program because, although Plaintiff met the requirements of the Muslim faith group, Defendant Scott was unable to verify that Plaintiff's own religious practice required a special religious diet.  (Scott Aff. ¶ 13.)  In rendering the final decision on Plaintiff's request, however, Defendant Connors concluded that Plaintiff did not qualify for a religious diet, not because he failed to demonstrate that a religious diet was part of his Islamic beliefs, but instead because Plaintiff could not "verify that [he was] a practicing member of any mosque."  (Mot., Ex. D.)  Thus, Defendants Scott and Connors used very distinct grounds for denying the exact same request because their respective reviews of Plaintiff's request were apparently not guided by any appreciable standard.[6]  In addition, outside of filing standard inmate grievances, which in this case went unanswered, Plaintiff had no recourse to challenge Defendants Scott and Connor's resolution of his diet request.

Further, it does not appear that the DCJ policy provides any requirement as to what information the Chaplain *must* consider in evaluating a religious diet request.  Here, Defendant

---

[6] Giving the DCJ policy an extraordinary benefit of the doubt, there is a modicum of evidence suggesting that the DCJ policy' standard requires an inmate to be a practicing member of a mosque, synagogue, or church before he may receive a religious diet.  This construction of the policy finds a *sliver* of support in the Special Diet Request form, which includes a field for the Chaplain to record an inmates' "Synagogue/Mosque/Church" immediately below the field for recording the approval or denial of the inmates' religious diet request, and the fact that Defendant Connors' denial of Plaintiff's request was based on the fact that he did not demonstrate that he was a practicing member of a mosque.

Even assuming this is the DCJ policy's governing standard, however, it nevertheless would still constitute a substantial burden on religious exercise.  Membership in a organized religious denomination is not a prerequisite for a sincerely held religious belief.  *Frazee v. Ill. Dept. of Emp. Sec.,* 489 U.S. 829, 834 (1989); *see also Vinning-El v. Evans,* 657 F.3d 591, 593 (7th Cir. 2011) ("A personal religious faith is entitled to as much protection as one espoused by an organized group").  As such, requiring a inmate to prove that he is a member of an organized religious denomination before allowing him to exercise his sincerely held religious beliefs would constitute a substantial burden on that exercise.

Scott contacted the CDOC representative and Mr. AL-Amin.  (Scott Aff. ¶¶ 10-12.)  However,

Plaintiff also listed the Adams County Detention Facility as a reference in his Religious Diet

Request.  (Mot., Ex. C.3.)  Nevertheless, Defendant Connors did not contact the Adams County

Detention Facility, and therefore failed to learn that Plaintiff had qualified for and received a

kosher diet while incarcerated at that facility in 2008.  (Resp. at 15-16; Handy Decl., Ex. 4.)

Ultimately, because the DCJ policy concerning religious diet requests appears to be

underdeveloped, inmates are required to demonstrate the sincerity of their religious beliefs to the

Chaplain or other DCJ official(s)' subjective satisfaction.  Further, DCJ staff appear to have

unfettered discretion to selectively choose which of the references submitted in the Religious

Diet Request to consider.  The policy's shortcomings create a risk that inmates who sincerely

believe in keeping a kosher or halal diet may have their religious diet request arbitrarily denied.

This result may not only prevent inmates from participating in conduct motivated by their

sincerely held beliefs, it also forces them into a Hobson's choice of either eating a non-halal diet

or not eating at all.  *Abdulhaseeb,* 600 F.3d at 1317; *see also Caruso,* 2005 WL 5957978, at *17

("a burden on religious exercise is 'substantial' under RLUIPA if it denies [a plaintiff]

'reasonable opportunities' to engaged in religious exercise . . . .").  As such, the court finds that

there is a genuine issue for trial on a material matter as to whether the DCJ policy substantially

burdens inmates' religious exercise.

### c.   *Compelling Government Interest and Least Restrictive Alternative*

Defendants maintain that the economic burden of providing religious kosher diets

without any inquiry into the sincerity of the recipient inmates' belief constitutes a compelling

government interest.  (Reply at 17.)  The Tenth Circuit has recognized that reducing prison

maintenance costs may be a compelling government interest. *Abdulhaseeb,* 600 F.3d at 1318. Even confessing that the DCJ had a compelling government interest to constrain its costs, the court finds on the facts before it that the policy implemented to address this issue was not the least restrictive alternative available to the DCJ.

The court first notes that, even though they bear the burden of proof on this issue, *see id.*, Defendants have asserted only conclusory arguments that the DCJ policy constituted the least restrictive alternative available to the DCJ (*see* Mot. at 24; Reply at 18). Nevertheless, on the facts submitted at this juncture, it is clear to the court that there were less restrictive policy alternatives to the one implemented by the DCJ in 2008. *See United States v. Wilgus,* 638 F.3d 1274, 1284 (10th Cir. 2011) ("whether the government has chosen the least restrictive means to advance its compelling interest is a question of law"). In so concluding, the court acknowledges that ordinarily it should give "due deference to the experience and expertise of prison and jail administrators." *Cutter,* 544 US. at 723 (quotation omitted). However here the court finds that the DCJ's policy is "inadequately formulated," which is insufficient to meet the acts requirements. *Abdulhaseeb,* 600 F.3d at 1318 (quoting 146 Cong. Rec. 16698, 16699 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy)).

As discussed above, the simple addition of a standard for resolving inmate religious diet requests would have plainly been a less restrictive alternative to the DCJ policy as implemented. Of course, any such standard might still constitute a substantial burden if inmates were required to make an inordinate showing of the sincerity of both their religious beliefs and their need for a halal or kosher diet. Nevertheless, because the DCJ policy does not appear to constrain the Chaplain's discretion in reviewing inmate religious diet requests in any way, the court concludes

at this stage in the proceedings that the DCJ policy was not the least restrictive alternative available to the DCJ.

Altogether, for the foregoing reasons, the court finds that Plaintiff's has set forth a several triable issues of fact with respect to his RLUIPA claim.  Therefore, the court finds that Defendants' Motion is properly denied to the extent that it seeks summary judgment on Plaintiff's official-capacity RLUIPA claim.

**B.**     ***Claim Two – Free Exercise***

   **1.**     ***Personal Participation of Defendant Diggins***

Defendants first argue that the undisputed evidence demonstrates that Defendant Diggins did not personally participate in any violation of Plaintiff's constitutional rights.  (Mot. at 14.) The court disagrees.

The Tenth Circuit has held that, even after the Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) regarding § 1983 supervisory liability, a defendant-supervisor may still be liable under § 1983 when he or she "creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution . . . .'" *Dodds v. Richardson,* 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting § 1983).  Here, Defendant Diggins admits that, as the Chief of the Denver County Jails Division, his duties include "implementing policies and practices adopted by the Denver Sheriff Department."  (Mot. Ex. A, Affidavit of Elias Diggins [Diggins Aff], ¶ 2.)  As such, Defendant Diggins may be held liable under section

§ 1983 if his implementation of the religious diet program (*see id.* ¶ 11) subjected Plaintiff to the deprivation of his First Amendment free exercise rights. *Dodds,* 614 F.3d at 1199.

Additionally, Plaintiff must also establish that Defendant Diggins "acted with the state of mind required to establish the alleged constitutional deprivation." *Id.* Plaintiff "must assert conscious or intentional interference with his free exercise rights" to establish a § 1983 claim for violations of his free exercise rights. *Gallagher v. Shelton,* 587 F.3d 1063, 1069 (10th Cir. 2009) (quoting *Lovelace v. Lee,* 472 F.3d 174, 201 (4th Cir. 2006)). However, here Plaintiff submitted a number of grievances to Defendant Diggins complaining that the decision to deny him a kosher diet under the DCJ policy violated his First Amendment free exercise rights. Plaintiff further maintains that all of those grievances went unanswered. The court finds this evidence to be sufficient to create a genuine issue of material fact as to whether Defendant Diggins acted consciously or even intentionally in implementing the DCJ policy in a manner that violated Plaintiff's constitutional rights.

To be clear, the court is not suggesting that Defendant Diggins violated Plaintiff's free exercise rights simply by failing to respond to Plaintiff's grievances. The Tenth Circuit has held that the "denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983." *Gallagher,* 587 F.3d at 1069 (citing *Whitington v. Ortiz,* 307 F. App'x 179, 193 (10th Cir. 2009); *Larson v. Meek,* 240 F. App'x 777, 780 (10th Cir. 2007)). Rather, Defendant Diggins may be held personally liable because he implemented the DCJ policy alleged to have violated Plaintiff's free exercise rights, and the grievances he received suggest that he may have done so consciously or

24

intentionally.  Therefore, granting summary judgment in favor of Defendant Diggins on this ground prior to trial is improper.

> ### 2.        *Substantial Burden on Sincerely Held Beliefs*

While the respective inquiries under RLUIPA and the Free Exercise Clause of the First Amendment differ in an important respect, the initial showing of a substantial burden on religious exercise is the same.  *Strope v. Cummings,* 381 F. App'x 878, 881 (10th Cir. 2010) (citing *Abdulhaseeb,* 600 F.3d at 1312-15; *Gallagher,* 587 F.3d at 1069-70).  For the reasons discussed above, the court finds that Plaintiff has demonstrated a genuine issue for trial on a material matter as to whether the implementation of the DCJ policy regarding religious diet requests placed a substantial burden on his religious practice.

> ### 3.        *Legitimate Penological Interests*

After the initial showing of a substantial burden on sincerely held beliefs, the analyses under RLUIPA and the Free Exercise diverge.  Under the Free Exercise Clause, the burden shifts to Defendants to show that "legitimate penological interests [] justif[ied] the impinging conduct." *Boles v. Neet,* 486 F.3d 1177, 1182 (10th Cir. 2007) (internal quotation marks and citation omitted).  At that point, the court balances the factors set forth in *Turner v. Safley,* 482 U.S. 78, 89-91 (1987), to determine the reasonableness of the regulation:

> (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Boles,* 486 F.3d at 1181 (quoting *Beerheide v. Suthers,* 286 F.3d 1179, 1185 (10th Cir. 2002)).

The *Safley* reasonableness inquiry is a mixed question of law and fact. *Mosier,* 937 F.2d at 1525

(citing *Hall v. Bellmon,* 935 F.2d 1106, 1113 (10th Cir. 1991); *Iron Eyes v. Henry,* 907 F.2d 810,

813 (10th Cir. 1990); *Friedman v. Arizona,* 912 F.2d 328, 331 (9th Cir. 1990)).  That is, at this

juncture, any dispute of material fact must be resolved in Plaintiff's favor; thereafter, the

reasonableness of the policy is a matter of law.  *See id.*

Here, Defendants have articulated a legitimate penological interest in the form of prison

cost containment for requiring verifiable proof of an inmate's sincerely held beliefs prior to

providing inmates with a halal or kosher diet.  *See Beerheide*, 286 F.3d at 1186 ("Without doubt,

prison administrators have a legitimate interest in working within a fixed budget.")  Further, the

DCJ policy is rationally related to that goal; the DCJ policy's verification process endeavors to

mitigate the costs that would result if any and all inmates were permitted to receive a kosher diet

without regard to their religious beliefs.  *See Turner,* 482 U.S. at 90 (a regulation should be

sustained unless "the logical connection between the regulation and the asserted goal is so

remote as to render the policy arbitrary or irrational.")

Nevertheless, considering the facts in a light most favorable to Plaintiff, the court finds

that the remaining *Turner* factors lean toward Plaintiff.  As to the second factor, the appropriate

inquiry is not whether Plaintiff had alternative outlets to exercise his Islamic faith generally, but

instead "whether plaintiffs have alternative means by which to exercise the right to maintain a

kosher diet."  *Beerheide*, 286 F.3d at 1187.  Here, there is no evidence that Plaintiff had

alternative means by which to obtain a kosher or halal diet.  Even assuming that Plaintiff could

have purchased kosher meals from an internal source, such as the DCJ commisary, or an outside

source, there is no evidence to suggest that Plaintiff had the financial means to do so.  *See id.* (rejecting the proposed alternative of purchasing kosher meals from the prison canteen as financially impossible for prisoners of limited means.").

As to the third factor, the court finds that revising the DCJ policy to include an appropriate standard or guidelines for reviewing kosher meal requests would not have a substantial impact on prison guards, inmates, or prison resources.  While devising a new policy might initially may place a slight burden on DCJ command staff and administrative resources, the process would ultimately benefit the Chaplain, or any other DCJ staff involved in reviewing religious diet requests, by providing them a proper rubric under which to evaluate kosher diet requests to maintain uniformity within the inmate population.  Indeed, by providing a framework for the Chaplain's review, it is likely that a revised policy would actually streamline the process of handling of inmate religious diet requests.

The court acknowledges that it must "be particularly deferential to the discretion of corrections officers when the accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff."  *Hammons v. Saffle,* 348 F.3d 1250, 1257 (10th Cir. 2003) (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 352-53 (1987)).  However, the court makes clear that it is not suggesting that the DCJ policy regarding religious diets be abrogated in its entirety, such that the DCJ would be faced with an influx of unverified kosher diets requests and the associated costs.  Rather, the policy may need to only be modified to better balance the DCJ's cost-based interest in preventing insincere inmates from receiving the expensive kosher diet, against the risk of burdening the religious exercise of inmates who sincerely adhere to a kosher diet.

27

The final *Turner* factor may well be dispositive in this case as "the existence of [an] obvious, easy alternative may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner,* 482 U.S. at 90.  For the reasons discussed above, an obvious and easy-to-implement alternative exists to accommodate Muslim inmates' rights to receive a kosher diet.  The DCJ policy could readily be modified to incorporate a uniform standard for evaluating religious diet requests.  Ultimately, the initial costs associated with making such a change would likely be *de minimis.  See id.* at 91.  However, even if the court is underestimating the costs associated with implementing such a change, any modest costs or burden pales in comparison to the "costs" associated with wrongfully denying a kosher diet to an inmate who sincerely believes that his faith requires him to adhere to such a diet.

Accordingly, on the facts before the court at this juncture, the court's review of the *Turner* factors demonstrates that the DCJ policy regarding inmate religious diet requests is not reasonable.  As it is currently formulated, the policy appears to constitute an "exaggerated response" to the DCJ's budgetary concerns.  *Id.* at 90.  Therefore, the court finds that Plaintiff has established a genuine issue as to whether his First Amendment free exercise rights were violated.

### 4.	*Qualified Immunity*

Although Plaintiff has established a genuine issue for trial as to whether Defendants violated his First Amendment free exercise rights, to avoid qualified immunity, Plaintiff must also establish that the right was clearly established at the time of the alleged constitutional violation.

After a plaintiff has established that the facts, taken in the light most favorable to him, that demonstrate that his constitutional rights were violated, "the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz,* 533 U.S. 194, 201 (2001) *overruled on other grounds by Pearson v. Callahan,* 555 U.S. 223 (2009). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Toevs v. Reid,* 646 F.3d 752, 755 (10th Cir. 2011).

Plaintiff maintains that the Tenth Circuit has "held that prisoners have a constitutional right to a diet conforming to their religious beliefs." (Resp. at 38 (citing *LaFevers v. Saffle,* 936 F.2d 1117, 1119-20 (10th Cir. 1991)). While this statement is correct, *see LaFevers,* 936 F.2d at 1119, the question of whether a right is clearly established must be addressed in the "context of the particular case before the court, not as a general, abstract matter." *Simkins v. Bruce,* 406 F.3d 1239, 1241 (10th Cir. 2005); *see also Saucier,* 533 U.S. at 201 (The clearly-established right inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition").

The court agrees with Defendants that the relevant inquiry is whether any Supreme Court or Tenth Circuit decision has held that a policy similar to the one implemented by the DCJ is contrary to law. (Mot. at 36.) Plaintiff has not set forth any case, much less a Tenth Circuit or Supreme Court decision, establishing that a policy similar to the one at issue in this case is unconstitutional. The court's independent review has uncovered only one district court decision from outside this circuit rejecting a policy similar to the DCJ policy under RLUIPA. *Roberts,* 770 F. Supp. 2d at 1113. A single district court decision from outside this circuit is insufficient

to make it "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202.

Although Plaintiff has established a genuine issue of material fact as to whether Defendants' violated his First Amendment free exercise rights, there was not any clearly established law to inform Defendants' that their conduct was unconstitutional.  As such, Defendants in their individual capacities[7] are entitled to qualified immunity from this claim.

------

[7] Upon review of the docket, it appears that Plaintiff's proposed official-capacity claims were rejected on improper grounds.  This court recommended that the District Court deny Plaintiffs' Motion to Amend to the extent it sought to add official-capacity claims because those claims were barred by sovereign immunity.  (*See* 5/6/2011 Order; *see also* 3/23/2011 Recommendation at 22.)  However, by attempting assert claims against Defendants in their official capacities, Plaintiff effectively sought to assert claims against a municipality—to wit, the City and County of Denver.  *See Kentucky v. Graham,* 473 U.S. 159, 165-66 (Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.") (citation and internal quotation marks omitted).  "As a general rule, Eleventh Amendment immunity does not extend to counties, municipal corporations and other local government units."  *Behunin,* 744 F. Supp. 255, 259 (D. Colo. 1990) (citing *Moor v. Cnty. of Alameda,* 411 U.S. 693, 717-21 (1973)).

Nevertheless, independent grounds existed to reject Plaintiff's proposed official-capacity claims.  More specifically, Judge Daniel adopted this court's recommendation to deny Plaintiff's third motion to amend to the extent it sought to add a § 1983 claim against the City and County of Denver.  (*See* 2/8/2012 Order; *see also* 12/21/2011 Recommendation at 5-9.)  Because Plaintiff's proposed allegations stated "[n]o where in the [DCJ] policy does it specify that inmates have to state what mosque they attend or give a source that can verify . . . that you are a practicing member of a mosque" and also that Plaintiff "did everything, exactly in the way it's outlined, in the aforementioned policy" (Proposed Am. Compl., Doc. No. 93-1, at 8), this court concluded, and Judge Daniel agreed, that Plaintiff had failed to sufficiently allege that the deprivation of his constitutional rights was inflicted pursuant to a municipal policy or custom. *See Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 691 (1978).  Rather, as *alleged,* Plaintiff's § 1983 claims presented a question of whether certain defendants failed to abide by a written policy.  (12/21/2011 Recommendation at 7.)  The fact that it now appears that the policy *was* the driving force behind any violation of Plaintiff's constitutional rights does not alter the court's prior holding that Plaintiff failed to sufficiently allege such a claim.  Accordingly, even though Plaintiff's proposed official-capacity claims were rejected on erroneous grounds, they would have nevertheless been futile because they failed to state a claim upon which relief can be granted.

Accordingly, the court finds that Defendants' Motion is properly granted to the extent that it seeks summary judgment on Plaintiff's Claim Two.

**C.      Claim Three – Equal Protection**

Defendants argue that they are entitled to summary judgment on Plaintiff's equal protection claim because Plaintiff has failed to establish that Defendants were motivated by a discriminatory purpose and that he was treated differently from others similarly situated.  (Mot. at 24-26.)  The court agrees.

To establish an equal protection violation, an inmate must show that "he was singled out for [punishment] from among others similarly situated." *United States v. Johnson,* 765 F. Supp. 658, 660 (D. Colo. 1991).  Additionally, an inmate must prove that a discriminatory intent or purpose was a motivating factor in the decision of prison officials.  *See Copeland v. Machulis,* 57 F.3d 476, 480 (6th Cir. 1995) (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 256-66 (1977)); *see also Pfenninger v. Exempla, Inc.,* 116 F. Supp. 2d 1184, 1197 (D. Colo. 2000).

Plaintiff argues that "Defendants denied Plaintiff's request for kosher meals, knowing he is Muslim."  (Resp. at 28.)  However, Plaintiff has not submitted any evidence suggesting that Defendants denied his kosher diet request *because* he is Muslim.  The evidence in the record instead demonstrates only that Defendants denied his kosher diet request because Plaintiff could not show that he attended a mosque or, alternatively, because Plaintiff did not submit verification that his religious beliefs required him to adhere to a kosher or halal diet.  Even if these bases for denying his request were unreasonable, that does not establish that Defendants denied his kosher diet request *because* he is a Muslim.

Further, Plaintiff has not demonstrated that inmates of other religions were provided a kosher diet under circumstances similar to his own.   Although Plaintiff maintains that Defendants "authorize[d] kosher meals for other inmates," (*id.*)  the supporting statement in his declaration states only that the DCJ provided "Catholics, Christians, and Jews with religious implements and symbols." (Handy Decl. ¶ 26.)  Defendants purported failure to provide Plaintiff and other Muslims with religious implements and symbols to practice Islam is not, and has never been, the subject of his Complaint.  Otherwise, there is no evidence in the record to support Plaintiff's position that Christian and Jewish inmates were provided with a kosher diet under circumstances similar to Plaintiff's.

Accordingly, the court finds that Plaintiff has failed to establish a violation of his Fourteenth Amendment rights to equal protection.  As a consequence, Defendants are entitled to qualified immunity from Plaintiff's equal protection claim.  *Saucier,* 533 U.S. at 201 (the first question in the qualified immunity inquiry is whether the facts, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right). Therefore, the court finds that Defendants' Motion is properly granted to the extent that it seeks summary judgment on Plaintiff's Claim Three.

**D.      *Claim Four – Due Process Claim***

**1.      *Constitutional Violation***

Plaintiff's Claim Four alleges that Defendants' denial of his request for a kosher diet impermissibly amounted to punishment in violation of his Fourteenth Amendment due process rights.

"[U]nder the Due Process Clause, a [pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish,* 441 U.S. 520, 537 (1979). Thus detainees who have not be convicted may not be punished, and the conditions of their confinement must not amount to punishment. *Id.* at 535. Absent a finding that detention officials have expressed an intent to punish the detainee, whether a condition is meant as punishment will usually turn on whether it is "reasonably related to a legitimate governmental objective." *Id.* at 538-39; *see also Bedford v. Sharp,* 120 F.3d 270, 1997 WL 413166 (10th Cir. July 23, 1997) (unpublished table opinion).

Defendants concede that the *Turner* factors discussed above with respect to Plaintiff's free exercise claim govern the determination under the Due Process Clause of whether a condition of confinement is reasonably related to a legitimate government objective or alternatively amounts to impermissible punishment. (Mot. at 26.) *See also Washington v. Harper,* 494 U.S. 210, 223-24 (1990) ("We made quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights"); *Patel v. Wooten,* 15 F. App'x 647, 650 (10th Cir. 2001).

For the reasons discussed above with respect to Plaintiff's free exercise claim, viewing the facts in the light most favorable to Plaintiff, the court finds that the DCJ policy is not reasonably related to a legitimate government objective under the *Turner* factors. Accordingly, the court finds that Plaintiff has established a triable issue of a material matter as to whether the DCJ policy amounted to impermissible punishment in violation of his constitutional rights to due process.

### 2. Clearly Established Law

Although Plaintiff has established a potential violation of his Fourteenth Amendment due process rights, the court finds that Defendants are entitled to qualified immunity with respect to Claim Four.  As discussed above with respect to Plaintiff's free exercise claim, Plaintiff has not identified, nor can the court otherwise locate, any Supreme Court or Tenth Circuit decision, holding that a policy similar to the DCJ policy violates an inmates' First Amendment free exercise rights.  More importantly, Plaintiff has not identified, nor can the court otherwise locate, a Supreme Court or Tenth Circuit decision holding that a policy similar to the DCJ policy violates an inmates right to be free from punishment under the Due Process Clause.  As such, Defendants are entitled to qualified immunity from this claim.  *Saucier,* 533 U.S. at 201. Accordingly, the court finds that Defendants' Motion is properly granted to the extent that it seeks summary judgment on Plaintiff's Claim Four.

### E. Claim Five – § 1983 Conspiracy

Defendants argue that Plaintiff's conspiracy claim fails because Plaintiff has failed to establish that Defendants had a meeting of the minds to engaged in concerted action.  (Mot. at 27.)  The court agrees.

A § 1983 conspiracy claim requires a plaintiff to demonstrate the alleged conspirators had a meeting of the minds and engaged in concerted action to violate the plaintiff's constitutional rights.  *Gallegos v. City & Cnty. of Denver,* 984 F.2d 358, 364 (10th Cir. 1993). To establish the existence of a conspiracy, a plaintiff must show that there was a "single plan, the essential nature and general scope of which [was] know[n] to each person who is to be held

responsible for its consequences." *Snell v. Tunnell,* 920 F.2d 673, 701 (10th Cir. 1990) (citation omitted).

Plaintiff maintains that he has set forth sufficient evidence to support the existence of a conspiracy amongst Defendants. However, although the facts that Plaintiff points to may support his claims that Defendants violated his free exercise and RLUIPA rights, they do not demonstrate that Defendants had an agreement or meeting of the minds to do so. More specifically, Defendants may have denied his kosher diet request even though they knew he was a Muslim, and Defendants Scott and Connors discussed their findings with eachother before rendering a decision on Plaintiff's request; these facts does not, however, establish that Defendants agreed or had a meeting of the minds to violate Plaintiff's constitutional rights. Likewise, the fact that Defendant Connors may have sent copies of the letter denying Plaintiff's request to Defendants Diggins and Burris falls well short of establishing that these Defendants conspired to violate Plaintiff's rights.

Accordingly, the court finds that Plaintiff has failed to establish the elements of a § 1983 conspiracy claim. As a consequence, Defendants are entitled to qualified immunity from Claim Five. *Saucier,* 533 U.S. at 201. Therefore, the court finds that Defendants' Motion is properly granted to the extent that it seeks summary judgment on Plaintiff's Claim Five.

**F.      *Claim Six – Failure to Intervene***

Defendants maintain that the are entitled to summary judgment on Plaintiff's sixth claim because a failure to intervene is claim is derivative of a § 1983 claim for excessive force and Plaintiff has not alleged a use of excessive force in this case. (Mot. at 28.) In his response, Plaintiff concedes this claim. (*See* Resp. at 31.)

Plaintiff is correct to concede this claim.  A failure to intervene may give rise to liability under § 1983 only where a plaintiff's allegations involve a use of excessive force.  *See, e.g., Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008); *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996); *see also Lynch v. Barrett*, 09–cv–00405–JLK–MEH, 2010 WL 3938357, at *6 (D. Colo. June 9, 2010) (citing *Brooks v. Brown,* No. 95-1386, 1996 WL 460048, at *3 (10th Cir. Aug. 14, 1996)) ("The failure to intervene theory is clearly derivative of an excessive force claim; if a plaintiff did not suffer excessive force, there can be no failure to intervene claim."). Here, Plaintiff has not alleged, much less proven, that he was the target of excessive force. Therefore, Plaintiff has failed to establish a § 1983 failure to intervene claim and Defendants are entitled to qualified immunity with respect to this claim.  Accordingly, Defendants' Motion is properly granted as to Claim Six.

**G.      *Claims Eight and Nine – § 1985(3)Conspiracy and § 1986 Neglect to Prevent***

Plaintiff's Claim Eight alleges that Defendants conspired to deprive Plaintiff of equal protection, or equal privileges and immunities, under the law.  Defendants maintain that they are entitled to summary judgment on this claim because Plaintiff has failed to show that Defendants' actions were motivated by a racial or other class-based discriminatory animus.  (Mot. at 28-29.) The court agrees.

To establish an actionable conspiracy under § 1985(3), a plaintiff must prove that the conspiracy was motivated by "some racial or otherwise class-based discriminatory animus."  *See Dixon v. City of Lawton*, 898 F.2d 1443, 1447 (10th Cir. 1990); *see also Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 101-02 (1971)) ("Section 1985(3) does not 'apply to all tortious, conspiratorial interferences with the rights of

others,' but rather, only to conspiracies motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'") As discussed above with respect to Plaintiff's equal protection claim, although Defendants may have denied his request for a kosher diet despite knowing he is Muslim, Plaintiff has not established that they did so *because* he is Muslim.  In fact, the evidence suggests that the denial may have been motivated by economic reasons because providing a kosher diet costs three times more than the standard diet. Additionally, Plaintiff has failed to set forth any evidence tending to prove that Muslims were denied a kosher diet more often than members of any other religions subscribing to special dietary restrictions.

In addition, for the same reasons discussed above with respect to Plaintiff's § 1983 conspiracy claim, Plaintiff has failed to establish that Defendants had an agreement or meeting of the minds to violate his constitutional rights.  *Merritt v. Hawk,* 153 F. Supp. 2d 1216, 1225 (citing *Brever v. Rockwell Int'l Corp.,* 40 F.3d 1119, 1126 (10th Cir. 1994) (A § 1985(3) conspiracy claim "requires plaintiff [to] demonstrate direct or circumstantial evidence of a meeting of the minds or agreement among the defendants.").

Plaintiff's Claim Nine alleges that Defendants neglected or refused to prevent the § 1985(3) conspiracy that is the subject of Claim Eight.  However, absent a viable § 1985(3) conspiracy claim, a § 1986 neglect or refusal to prevent claim must also fail.  *Brown v. Reardon,* 770 F.2d 896, 906 (10th Cir. 1985).  Because Claim Eight fails, Plaintiff's Claim Nine must also fail.  *Id.*

Accordingly, the court finds that Plaintiff has failed to establish claims under § 1985(3) or § 1986.  As such, Defendants are entitled to qualified immunity from these claims.  *Saucier,*

533 U.S. at 121.  Therefore, the court finds that Defendants' Motion is properly granted as to

Claims Eight and Nine.

**H.**      *State Law Claims*

Defendants maintain that they are immune from Plaintiff's state law tort claims because

Plaintiff failed to timely submit notice of his claims, as required by § 24-10-109 of the Colorado

Governmental Immunity Act (CGIA).  The court agrees.

Section 24-10-109(1) provides:

> Any person claiming to have suffered an injury by a public entity or by an
> employee thereof while in the course of such employment, whether or not by a
> willful and wanton act or omission, shall file a written notice as provided in this
> section within one hundred eighty-two days after the date of discovery of the
> injury, regardless of whether the person then knew all the elements of a claim or
> of a cause of action for such injury.  Compliance with the provisions of this
> section shall be a jurisdictional prerequisite to any action brought under the
> provisions of this article, and failure of compliance shall forever bar any such
> action.

Colo. Rev. Stat. § 24-10-109(1).

Compliance with the notice provision implicates the court's subject-matter jurisdiction.

*Id.*; *City and County of Denver v. Crandall*, 161 P.3d 627, 634 (Colo. 2007) (stating that "[t]he

CGIA notice of claim provision is both a condition precedent and a jurisdictional prerequisite to

suit under the CGIA, must be strictly applied, and failure to comply with it is an absolute bar to

suit").  *See also Trinity Broadcasting of Denver, Inc., v. City of Westminster*, 848 P.2d 916, 924

(Colo. 1993).  The burden is on the plaintiff to "demonstrat[e] that notice was properly filed so

that the suit may proceed."  *Finnie v. Jefferson Cnty. Sch. Dist.,* 79 P.3d 1253, 1261 (Colo.

2003).  Although the timeliness requirement of the statute is jurisdiction and subject to strict

complained, other issues, such as whether the notice was delivered to the proper entity are

subject to a substantial compliance standard.  *Id.* at 1255-56; *see also Crandall,* 161 P.3d at 632

n.5.  "Substantial compliance" requires "a good faith effort to include, as far as is reasonably

possible, the listed information."  *Awad v. Breeze,* 129 P.3d 1039, 1041 (Colo. App. 2005).

The City and County of Denver County is a public entity.  Its Governing body is the

Denver County Board of Commissioners.  Colo. Rev. Stat. § 30-11-103.  The Denver City

Attorney represents the City and County of Denver.  The designated agent for service of process

on the City and County of Denver is "the county clerk, chief deputy, or county commissioner."

Colo. R. Civ. P. 4(e)(7).

The court finds that Plaintiff has failed to demonstrate that he substantially complied with

§ 24-10-109.  In support of his contention that he filed notice in accordance with § 24-10-109,

Plaintiff cites to an exhibit attached to his original Complaint.  (Compl., Ex. Q.)  However,

although that notice was submitted within the 182-day statutory period, the notice indicates that

it was sent to the Colorado State Attorney General's Office rather than to the Denver City

Attorney's Office.  (*Id.*)  Ms. Julie Harl, the Claims Adjuster for the Denver City Attorney's

Office, has reviewed the notice of claims filed with the City and County of Denver, and has

confirmed that Plaintiff did not file a notice of claim with the City and County of Denver

regarding the subject matter of his claims against Defendants.  (Mot., Ex. G, Declaration of Julie

Harl ¶¶ 4-6.)

Although not argued by either party, the court notes that the facts in this case are

distinguishable from those presented in *Cassidy v. Reider,* 851 P.2d 286, 288-89 (Colo. App.

1993).  The *Cassidy* court concluded that a notice that named the wrong entity as the addressee

was not fatally defective.  *Id.*  The notice was delivered to the proper entity and was received by

39

that entity's attorney the next day; it simply included the wrong entity as the addressee. *Id.* Under those circumstances, the court held that the plaintiff had substantially complied with the requirements of § 24-10-109. *Id.*

Here, there is no indication that Plaintiff's notice was actually submitted to the City and County of Denver or its attorney. Further, because Plaintiff knew or should have known of his injury on April 15, 2010, when Defendant Connors denied his kosher diet request, Plaintiff was required to serve notice on the City and County of Denver or the Denver City Attorney's Office no later than October 14, 2010. However, Plaintiff's original Complaint, featuring the notice as an attachment, was not served on Defendants until October 26, 2010.

Accordingly, because Plaintiff failed to serve notice of his claims on City and County of Denver or the Denver City Attorney's Office prior to October 14, 2010, his state law tort claims are barred under the CGIA. Therefore, Defendants' Motion is properly granted with respect to Plaintiff's state law claims.

## CONCLUSION

For the reasons discussed in this Recommendation, the court finds that Plaintiff has established a genuine issue of material fact as to whether his rights under RLUIPA were violated. Therefore, Defendants' Motion is properly denied as to Claim One. However, the court finds that Defendants are entitled to qualified immunity, and therefore summary judgment, on Plaintiff remaining federal law claims either because (1) Plaintiff has failed to establish a violation of his constitutional rights, or (2) there was no clearly established law to advise Defendants that their conduct at issue in this case was unconstitutional. Finally, the court finds

Defendants' Motion is properly granted as to Plaintiff's state law tort claims because, pursuant to the CGIA, the court lacks subject-matter jurisdiction over these claims.

WHEREFORE, for the foregoing reasons, the court respectfully

**RECOMMENDS** that Defendants' Motion and Brief for Summary Judgment" (Doc. No. 204) be **GRANTED** in part and **DENIED** in part. Specifically, the court recommends that Defendants' Motion be denied to the extent that it seeks summary judgment on Plaintiffs' Claim One for a violation of RLUIPA. The court recommends that Defendants' Motion be granted in all other respects, and that summary judgment be entered in favor on Defendants on Plaintiff's remaining claims.

### ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the

magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule");  *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review);  *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 26th day of February, 2013.

BY THE COURT:

Kathleen M Tafoya
United States Magistrate Judge